**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                    CASE NO.   3:09-cr-337-J-34-TEM

IAN HAFFNER

_____

### <u>REPORT AND RECOMMENDATION</u>[1]

#### I. Status

     This matter is before the Court on referral by the Honorable Marcia Morales Howard for a report and recommendation on Defendant Ian Haffner's motions to suppress evidence. Between May 5 and June 23, 2010, Defendant filed five motions seeking to suppress evidence obtained during the investigation of his case (*see* Docs. #36, #37, #38, #41 and #60). Defendant has moved to suppress statements he made to Immigrations and Customs Enforcement (ICE) agents on April 29, 2009, as well as information obtained by the ICE agents from a search of Mr. Haffner's laptop computer. The United States filed responses in opposition to each of Defendant's motions (*see* Docs. #42, #43, #44, #45 and #65). The Court held evidentiary hearings on June 8, 2010 and July 14, 2010. Transcripts of the proceedings have been filed (Docs. #56 and #74) (hereinafter referred to as "Tr. 1" and "Tr. 2", followed by the appropriate page number).[2] With the Court's permission,

---

[1]As a matter of course, within fourteen (14) days after service of this document, specific, written objections may be filed in accordance with 28 U.S.C. § 636, Rule 59, Federal Rules of Criminal Procedure, and Rule 6.02, Local Rules, United States District Court, Middle District of Florida. Failure to file a timely objection waives a party's right to review. Fed. R. Crim. P. 59.

[2]Also contained within the record is a transcript of the April 29, 2009 audio-taped interview of Defendant by ICE agents Greenmun and Jones. Defendant initially filed a transcript of the recording (*see* Doc. #40). The United States entered a copy of the transcript into the

Defendant filed a supplemental memorandum of law in support of his position on June 24, 2010 (Doc. #61) and the United States filed a supplemental memorandum in opposition on July 1, 2010 (Doc. #63).   Upon consideration of the argument from counsel and the evidence presented, the undersigned recommends the motions to suppress **be denied**.

## II.  Background

On October 29, 2009, a grand jury returned a two count indictment charging Defendant Ian Haffner (hereinafter referred to as "Defendant") with knowingly receiving and attempting to receive visual depictions using a means and facility of interstate and foreign commerce, that is, by computer via the Internet, including by computer, the production of which involved the use of minors engaging in sexually explicit conduct, which visual depictions were of such conduct, in violation of Title 18, United States Code, Section 2252(a)(2) (Doc. #1).

Defendant seeks to suppress the statements he made and any evidence seized by law enforcement officers on April 29, 2009, the date he was interviewed in his home regarding the possible child pornography believed to be on his computer.   Defendant asserts the law enforcement agents were able to discover his identity and location through an unlawful search that occurred in the State of Virginia in February 2008 and unlawful access to his school records from Flagler College (*see* Docs. #36 and #60).   Defendant requests suppression of the statements on the basis any statements he made were involuntary and without a knowing and intelligent waiver of his Fifth and Sixth Amendment rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966).   More specifically,

---

record during the June 6, 2010 hearing (Gov't Exh. 4).  Government Exhibit 4 contains minimal corrections to the transcript offered by Defendant.

Defendant asserts any statements he made resulted from the use of coercion, trickery and misrepresentations by the agents that led to his "acquiescence to the agents' claim of lawful authority"(Doc. #38 at 4; *see also* Doc. #60, "The student records unlawfully obtained by law enforcement were thereupon used to obtain other evidence from the Defendant.").

The United States argues the Defendant does not have standing to challenge the search of another person's computer in Virginia, nor does he have a reasonable expectation of privacy in the contents of that computer (Doc. #42).  The United States further argues the Defendant was not subjected to a custodial interrogation that would trigger the application of *Miranda* to the April 29, 2009 interview, but even if he were found to have been in custody, the agents properly informed Defendant of his rights under *Miranda* (Doc. #43).  The United States also asserts the agents did not illegally obtain any information from Flagler College, nor was the information they did obtain used to contact the Defendant or subsequently obtain statements and evidence from him (Doc. #65).

Upon consideration of all the evidence presented and the arguments made, the Court makes the following findings of fact and conclusions of law.

### III.  Findings of Fact

The evidence presented at the first hearing revealed that on April 29, 2009 at approximately 3:00 p.m. two individuals, Agent Greenmun and Detective Jones, who were working on a joint law enforcement task force overseen by Immigration and Customs Enforcement, went to Defendant's residence in St. Johns County to conduct an interview of the Defendant (Tr. 1 at 8, 78) The purpose of the interview was to determine if the Defendant was involved in the trading of child pornography over the internet (Tr. 1 at 8, 78). ICE became interested in Defendant because computer searches in Virginia and Victoria,

3

Canada revealed a screen name (also known as a "handle") that was ultimately identified as belonging to Defendant (Tr. 1 at 38-50).   Defendant's identity was obtained by ICE agents through a search of a David Didio's computer in Blacksburg, Virginia and the issuance of subsequent summons to the internet service providers Google and AmericaOnline (Tr. 1 at 42-49, 68-69; Doc. #36-1).   When the ICE agents arrived at Defendant's home they were greeted by someone who the agents presumed was one of Defendant's roommates (Tr. 1 at  8).

When Defendant came to the door the agents identified themselves and asked if Defendant had time to talk (Gov't Exh. 4 at 2-3).   Defendant invited the agents into his home and the three of them proceeded directly to the kitchen (Tr. 1 at 79-80).   Defendant sat down at the kitchen table and Agent Greenmun sat across from Defendant (Tr. 1 at 80). Detective Jones stood to the side in the doorway to the kitchen (i.e., the access opening for that room) (Tr. 1 at 81).   Agent Greenmun informed Defendant the reason the agents were there was because Defendant's name had come up in an investigation involving child pornography (Gov't Exh. 4 at 4).    Agent Greenmun and Defendant discussed the Defendant's internet and computer set-up at his residence, as well as Defendant's different handles (i.e., nicknames, screen names, or user ids on the internet) (Gov't Exh. 4 at 4-7).

Agent Greenmun verified Defendant attended school at Flagler College (Gov't Exh. 4 at 8-9).   Defendant stated he was a senior at Flagler with a major in Psychology, and he would graduate in December (Gov't Exh. 4 at 8).

Agent Greenmun then gave Defendant a document with four bullet points that the

agent described as a *Miranda* form (Tr. 1 at 8-9).[3]  Defendant read the items listed on the *Miranda* form out loud (Gov't Exh. 4 at 9).  In his reading of the *Miranda* form, Defendant actually noted and corrected the typographical error that was on the form (Tr. 1 at 99). Detective Jones informed Defendant that they were at Defendant's house as part of a criminal investigation (Gov't Exh. 4 at 10).

Both Agent Greenmun and Detective Jones then explained to Defendant how they identified Defendant through his "handle" and a computer search in Virginia,  and why they thought there may be child pornography on Defendant's computer (Gov't Exh. 4 at 10-23). When asked if he recognized any of twenty-nine (29) pictures that the agents had with them, the Defendant answered, "No" (Gov't Exh. 4 at 18-19).  Defendant then responded he hoped none of those photos would be found on his computer (Gov't Exh. 4 at 19). Greenmun and Jones explained that they were mainly concerned with making sure the trading in child pornography was not an ongoing issue (Gov't Exh. 4 at 20-23).  They told Defendant the best way for them to "figure out the threat level" would be for Defendant to consent to a search of Defendant's computer (Gov't Exh. 4 at 23).  Greenmun and Jones further told Defendant that as long as what Defendant told them was true, the computer would be returned to Defendant the following Monday (Gov't Exh. 4 at 24).  Defendant expressed concern that he had not "cleaned [the computer] off in a long time" and there might be child pornography still on the computer (Gov't Exh. 4 at 24-25).

---

[3]Government Exhibit 2: The U.S. Immigration and Customs Enforcement "Waiver of Rights" form given to Defendant contained the four following notes:
1.  You have the right to remain silent.
2.  Anything you say may be used against you.
3.  You have the right to have a lawyer.
4.  If you cannot afford a lawyer, one will be proved[sic] to you for free.

Greenmun specifically asked Defendant if he could see Defendant's computer, to which Defendant responded, "Yes. My room is a mess." (Gov't Exh. 4 at 30.)  At that point, the agents and Defendant went upstairs to Defendant's bedroom, where the computer was located (Tr. 1 at 11).   Detective Jones informed Defendant that whether ICE searched Defendant's computer or not was entirely up to Defendant (Gov't Exh. 4 at 31).   Defendant repeatedly expressed a desire to "wipe my hard drive" and asked Greenmun and Jones if he could just wipe the hard drive and be done with the investigation (Gov't Exh. 4 at 24-29, 31-33).   Detective Jones told Defendant that wiping the hard drive would not be helpful for either Defendant or ICE (Gov't Exh. 4 at 33).

After shutting down the computer and returning downstairs to the kitchen, Defendant signed a consent to search waiver (Tr. 1 at 19-20; Gov't Exh. 2).   Agent Greenmun exchanged contact information with Defendant and told Defendant that if Defendant had any questions, Defendant should not hesitate to contact Agent Greenmun (Gov't Exh. 4 at 36- 38).   After exchanging a few more words, Agent Greenmun and Detective Jones departed (Gov't Exh. 4 at 40-41).   The entire encounter lasted less than forty (40) minutes (*see* Gov't Exh. 3 & Gov't Exh. 4).

At the time of the interview, Agent Greenmun and Detective Jones were dressed in plain clothes, rather than in uniform (Tr. 1 at 17, 101).  Agent Greenmun testified that it was never his intent to arrest Defendant (Tr. 1 at 9) and at no point during the interview did he (Agent Greenmun) tell Defendant the he would be placed under arrest (Tr. 1 at 18).  While Defendant agreed that the ICE agents did nothing at the scene to suggest to Defendant that he was going to be placed under arrest, Defendant still testified to feeling detained (Tr. 1 at 104).  Agent Greenmun and Detective Jones were armed, but did not show Defendant

6

their weapons (Tr. 1 at 18, 101).  Defendant described the ICE agents' demeanor as "cordial" (Tr. 1 at 100).  Defendant testified that he did not know he could refuse consent to permitting the ICE agents entry into his home (Tr. 1 at 98). He stated he was hungover, surprised by their presence, (Tr. 1 at 78) and intimidated (Tr. 1 at 81).  While showing signs of nervousness (Gov't Exh. 3 and Gov't Exh. 4), Defendant did not objectively demonstrate behavior that would evince his feelings of being overwhelmed and intimidated during the course of the interview (*see* Tr. 1 at 104-08, Gov't Exh. 3 and Gov't Exh. 4).

### IV.  Analysis and Conclusions of Law

Motions to suppress evidence relevant to a criminal trial present mixed questions of law and fact for the court's determination.  *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (internal citations omitted).  A circuit court of appeals reviews the district court's findings of fact under the clearly erroneous standard, but application of the law to those facts is subject to *de novo* review.  *Id.*

A warrantless entry into a person's home is presumed to be an unreasonable violation of one's Fourth Amendment rights. *United States v. Ramirez-Chilel*, 289 F.3d 744, 751 (11th Cir. 2002) (citing *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (citing *Payton v. New York*, U.S. 573, 586 (1980)).  The warrrantless search of a residence is likewise presumed to be unreasonable.  *Id.*  However, consent to enter and consent to search a home are well recognized exceptions to the requirement that police obtain a warrant.  *Id.*  Yet, when consent to the entry into a residence was prompted by a show of official authority, the consent may not have been legally obtained and any evidence seized thereafter may be tainted by the illegal entry.  *United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986) (finding the defendant's action of stepping back from the front door

7

with his hands behind his head to be an acquiescence to a show of official authority in light of the number of FBI agents present and the announcement of their presence by an agent yelling "FBI. Open the door." ).

Defendant argues that pursuant to the Fourth and Fifth Amendments, *Miranda v. Arizona,* 384 U.S. 436 (1966), and *Edwards v. Arizona,* 451 U.S. 477 (1981), all statements made during the questioning at Defendant's residence and any evidence obtained from the search of the computer in Virginia and the search of Defendant's computer should be suppressed in this case (Docs. #36, #37, #38, #41, #60, and #61).   A number of legal issues have been identified in this matter as pertinent to the resolution of the motions to suppress.   Those issues include: (1) whether Defendant had a reasonable expectation of privacy in communications saved on another person's computer; (2) whether Defendant was in custody during the questioning on April 29, 2009; (3) whether Defendant's statements and consent to search were knowing and voluntary; (4) whether the search exceeded the scope of Defendant's consent; and (5) whether the agents illegally obtained information from Flagler College before the April 29, 2009 interview that tainted the evidence obtained from the interview itself.

**1.      Whether Defendant had a reasonable expectation of privacy in communications saved on another's computer**

The catalyst for identifying Defendant came from a search conducted on the computer reportedly belonging to a Mr. David Didio in Blacksburg, Virginia (Tr. 1 at 44-47, 68-69; Doc. #36-1).   Defendant asserts that his identification was a result of the execution of an unlawful Virginia search warrant and therefore all evidence in this case derived from that search should be excluded (Doc. #36 at 3).   Defendant claims the search warrant was

8

unlawfully obtained because the affidavit on which it is based is invalid and not supported by probable cause (Doc. #36 at 1-2). The Court finds it need not reach the issue of the sufficiency of the warrant because it concludes the Defendant did not have a Fourth Amendment right of privacy in the contents of Mr. Didio's computer. Therefore, Defendant cannot challenge the search itself.

The Fourth Amendment's prohibition against unreasonable searches and seizures only extends to those instances where an individual demonstrates a reasonable expectation of privacy against government intrusion. *United States v. King*, 509 F. 3d 1338, 1341 (11th Cir. 2007) *citing United States v. Cooper,* 203 F. 3d 1279, 1283-84 (11th Cir. 2000). In order to have standing to challenge the validity of a government search, an individual must actually have a reasonable expectation of privacy. *Id. See also Rehberg v. Paulk*, 611 F.3d 828, 842 (11th Cir. 2010) ("In order for Fourth Amendment protections to apply, the person invoking the protection must have an objectively reasonable expectation of privacy in the place searched or item seized.") (internal citations omitted).

Defendant must establish both a subjective and objective expectation of privacy. *See United States v. King,* 509 F. 3d at 1341, *quoting United States v. Segura-Baltazar*, 448 F. 3d 1281, 1286 (11th Cir. 2006). More specifically, Defendant must have had an actual expectation of privacy that society is prepared to recognize as reasonable. *Id.*

Defendant claims that he considered the screen name he used to communicate with Didio, and Defendant's instant message chats with Didio, to be private (Doc. #61 at 18; Tr. 1 at 88-89). Defendant argues that one of the reasons for using a screen name is to remain anonymous and to protect one's privacy (Doc. #61 at 18; Tr. 1 at 88). The Court acknowledges that Mr. Haffner may have believed he had a reasonable, and thus

9

legitimate, expectation of privacy in the instant chats and the e-mail communications between himself and Mr. Didio.  While whether Defendant believed the communications were private may be the first question to ask, it is not the operative question.  The operative question is whether the expectation of privacy was reasonable as viewed through the eyes of society.  *United States v. King*, 509 F.3d at 1341-42.

On this issue, the Court finds Mr. Haffner's expectation of privacy was not reasonable.  Any subjective expectation that Defendant may have had in the privacy of the contents of Mr. Didio's computer was not one which society is prepared to recognize as reasonable.

Pertinent to this case, the Google Hello application served as an instant messenger with the ability to send images (Tr. 1 at 68-70).  The messages Defendant sent via Google Hello could be seen by others on Mr. Didio's computer screen, could be saved and redistributed, and once sent could not be retrieved (Tr. 1 at 92-95).  In content, a message sent by Google Hello is very similar to an e-mail or a written letter.  Once Mr. Didio received the messages via the Google Hello application from Defendant, Defendant lost his reasonable expectation of privacy in the messages.  *See generally Rehberg v. Paulk*, 611 F.3d at 843 (noting some circuit decisions suggest an individual may not have a legitimate expectation of privacy in transmissions over the Internet or in e-mail that has already arrived at the recipient), *citing Guest v. Leis,* 255 F. 3d 325, 333 (6th Cir. 2001); *see also United States v. Lifshitz*, 369 F. 3d 173, 190 (2d Cir. 2004) (citing to *Guest* for the proposition that once an e-mail has reached its recipient the sender loses any legitimate expectation of privacy in the e-mail because at that moment the e-mailer becomes analogous to a letter-writer, whose expectation of privacy ordinarily terminates upon

delivery of the letter).  *Cf. United States v. Dunning,* 312 F. 3d 528, 531 (1ˢᵗ Cir. 2002) ("if a letter is sent to another, the sender's expectation of privacy ordinarily terminates upon delivery") (internal citations omitted).

Because any expectation of privacy Defendant may have had in Mr. Didio's computer and the conversations contained therein is unreasonable, Defendant suffered no violation of his Fourth Amendment rights when Mr. Didio's computer was searched. Defendant therefore cannot challenge the search.

**2.     Whether Defendant was in custody**

Defendant claims that the statements made during the April 29, 2009 interview were obtained in violation of *Miranda* and *Edwards* (Doc. #37 at 1-2).  Defendant asserts that he was not adequately advised of his *Miranda* rights and that he did not voluntarily, knowingly and intelligently waive his *Miranda* rights (Doc. #37 at 1-3).  Thus, the Court must determine whether the Defendant was in custody in order to ascertain whether there was a need for *Miranda* warnings to be given.  The requirements of providing a suspect with advice of his *Miranda* rights attaches at the point an individual is taken into custody by law enforcement officers.  *Miranda v. Arizona*, 384 U.S. at 491-92; *United States v. Brown*, 441 F. 3d 1330, 1347 (11ᵗʰ Cir. 2006).  Thus, the Court need consider the sufficiency of the *Miranda* warnings only if Defendant was in custody during the interview on April 29.[4]

---

[4]Although Defendant asserts a violation of *Edwards v. Arizona,* 451 U.S. 477 (1981)*,* Defendant does not show, nor does the Court see, any violation of *Edwards*.  In *Edwards*, the Supreme Court held that once a defendant asserts his right to an attorney, government officials must not subject the defendant to any further interrogation until counsel has been made available to the defendant, unless the defendant initiates communication with the police.  *Edwards*, 451 U.S. at 484-85.  Here, Defendant, himself, read aloud the substance of his *Miranda* rights, but did not request an attorney at any point during the April 29 encounter with ICE agents (Tr. 1 at 99; Gov't Exh. 4 at 9-10).

Custodial interrogations are inherently compulsive in nature. *Yarborough v. Alvorada*, 541 U.S. 652, 661 (2004), *citing Miranda*, 384 U.S. at 458. To protect an individual's Fifth Amendment privilege against self-incrimination, suspects subjected to a custodial interrogation must be informed that they have a right to remain silent, that anything they say can and will be used against them in court, that they have the right to an attorney, and that if they cannot afford an attorney, one will be provided for them. *Thompson v. Keohone,* 516 U.S. 99, 107 (1995), *citing Miranda,* 384 U.S. at 444. For purposes of *Miranda*, an individual is in custody "when there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Brown*, 441 F. 3d at 1346, *quoting California v. Beheler,* 463 U.S. 1121, 1125 (1983).

There is no particular fact in a custody analysis that is outcome determinative. *United States v. Brown,* 441 F. 3d at 1349. All that is required for the *Miranda* analysis to apply is that the defendant be in "a police-dominated atmosphere" and subject to state interrogation. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990). The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers *or the person being questioned. Stansbury v. California*, 511 U.S. 318, 323 (1994) (emphasis added).

To determine if Defendant was in custody on April 29, the Court will consider whether, under the totality of the circumstances, a reasonable person in Defendant's situation would have felt free to leave. *See United States v. Brown,* 441 F. 3d at 1347, *citing United States v. McDowell,* 250 F. 3d 1354, 1362 (11th Cir. 2001). In analyzing such circumstances, the Eleventh Circuit has found "[t]he test is objective: the actual, subjective

12

beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Brown,* 441 F. 3d at 1347, *quoting United States v. Moya,* 74 F. 3d 1117, 1119 (11th Cir. 1996).  A reasonable person for purposes of the test is a reasonable innocent person.  *Id.*

Here, there is no question that  Defendant was not placed under arrest on April 29, 2009.  Defendant invited the agents into the apartment (Gov't Exh. 4 at 3).  Neither of the agents told Defendant he was under arrest, nor did they do anything to suggest to Defendant that he was under arrest (Tr. 1 at 104).  Defendant was not handcuffed, nor was there any evidence of physical contact or control of Defendant by the agents.  *See generally Yarborough*, 541 U.S. at 664 (fact that police did not threaten defendant or suggest he would be placed under arrest weighed against a finding of custody); *see also United States v. Mittel-Carey,* 493 F. 3d 36, 40 (1st Cir. 2007) ("the element that carries the most weight is the level of physical control that the agents exercised over the defendant during the search and interrogation").  While Defendant was not specifically told that he was not under arrest, Defendant was informed the agents were at his home as part of a criminal investigation and if he wanted to stop the interview at anytime, he could (Gov't Exh. 4 at 10).  Defendant also testified at the hearing that he knew he had the option to talk to an attorney rather than to the agents (Tr. 1 at 105).

Further, while it is not dispositive, it is significant that the interview took place in surroundings that were familiar to Defendant.  *See United States v. Brown*, 441 F. 3d at 1348 (when interrogations take place in the suspect's home, courts are less likely to find the circumstances were custodial), *citing United States v. Ritchie,* 35 F. 3d 1477, 1485 (10th Cir. 1994); *also see United States v. Newton,* 369 F. 3d 659, 675 (2$^{d}$ Cir. 2004) (noting that

"absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial"). Defendant's own kitchen and bedroom are clearly familiar settings. The fact that Defendant was in a familiar setting weighs in favor of a non-custodial finding. *United States v. Brown,* 441 F. 3d at 1349.

The Court also considers the fact that the interview lasted for less than forty minutes and Defendant was not arrested at the end of the interview (Gov't Exhs. 3 & 4; Tr. 1 at 9, 22). Both of these facts are consistent with questioning where a reasonable person would have felt free to end the interview and leave, or request the agents to leave. *See generally Yarborough,* 541 U.S. at 665; *see also Oregon v. Mathias on,* 429 U.S. 492, 495 (1977) (finding the suspect was not in custody during a half-hour interview at the offices of the State Police, after which the suspect was not arrested and left the police station without hindrance). In this case, only two law enforcement officers were present during the interview, they were in plain clothes and did not display their firearms at any point (Tr. 1 at 101). *See Mittel-Carey*, 493 F. 3d at 39 (stating the number of law enforcement officers present at the scene is relevant to a custody determination). Defendant admits the interview was conducted in a very cordial manner (Tr. 1 at 100). Defendant also admits that the recording and transcript of the interview accurately depict the encounter; nothing was not captured that actually happened or should have been heard (Tr. 1 at 95-97).

The only piece of objective evidence that might weigh in favor of finding Defendant was in custody would be the fact that Detective Jones stood in the doorway of the kitchen area while much of the interview took place (Tr. 1 at 104). Defendant claims the detective's presence blocked the only avenue in and out of the kitchen and caused him to feel detained (Tr. 1 at 104). This single fact, however, does not overcome the weight of the other

14

evidence, particularly when Defendant did not ask Detective Jones to move from the doorway, did not give any indication that he wanted the interview to end, and he moved freely from the kitchen upstairs to his bedroom and back again to the kitchen  (Tr. 1 at 11, 18-20, 104-05).

Upon consideration of  the totality of the circumstances, the undersigned concludes that Defendant was not in custody during the interview of April 29, 2009.  Review of the transcript of the meeting at Defendant's residence and the audio recording of the entire interview reveals the tone of the interview was congenial and nonthreatening (Gov't Exhs. 3 & 4).  The audio recording provides substantial support for the Court's determination that a reasonable person would have felt he could terminate the interview (Gov't Exh. #3).  As Mr. Haffner was not in custody during the interview, the requirements of *Miranda* did not attach and the statements he made need not be suppressed.[5]

**3.     Whether Defendant's statements and consent to search were voluntary**

Defendant's next argument is that his statements and consent to search were not voluntary (Docs. #37-38, 61).  Defendant asserts that his statements were the product of duress and coercion**,** and were made as a result of his acquiescence to the agent's claim of authority (Doc. #37 at 1-2).  Defendant claims that his statements and his consent to search were involuntary because he did not feel free to leave, he was coerced, he was in a vulnerable state and was eager to reduce the degree and duration of contact between

---

[5]Even assuming arguendo that *Miranda* warnings were required to be given to Defendant under these facts, the undersigned finds the officers adequately complied with that requirement by providing Defendant with a written document that contained a statement of the individual *Miranda* rights, which Defendant read aloud and acknowledged he understood (Tr. 1 at 99, 105; Gov't Exh. 4 at 8-10).  On the facts of this case, the Court is convinced Mr. Haffner understood the rights he recited to the agents.

the agents and others on the premises.

Although the Court does not accept the requirement of *Miranda* warnings attached to the situation at hand, nevertheless, in an abundance of caution the Court will consider the voluntariness of Defendant's statements in light the legal precedence emanating from *Miranda*. Under *Miranda v. Arizona*, a defendant must be informed of his Fifth Amendment rights prior to custodial questioning. 384 U.S. at 492. If a defendant is not informed of his Fifth Amendment rights, any pretrial statements elicited during the custodial interrogation are inadmissible at trial. *Id.* *Miranda* also holds, however, that a suspect may waive effectuation of the rights conveyed in the warnings provided the waiver is made voluntarily, knowingly, and intelligently. *Id.* at 444, 475. Under *Miranda*, a waiver of rights may be explicit, or it may be implied by a suspect's actions or words. *See North Carolina v. Butler*, 441 U.S. 369, 378-79 (1979). In essence, the waiver inquiry has two distinct parts:

> First, the relinquishment of the right must have been voluntary in the sense it was the produce of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (*internal quotation marks and citations omitted*). The Supreme Court, in *Moran*, further stated "we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Id.* at 422.

Defendant asserts that he was unable to make a knowing and intelligent waiver of his *Miranda* rights due, primarily, to coercion and intimidation (*see* Doc. #38; Tr. 1 at 81-82,

16

98).  He argues the presence of two agents in possession of "large three ring binder" that apparently contained his "entire life" overwhelmed him, in some fashion, and led to his involuntary "acquiescence" to the presence of authority (Doc. #70 at 5-6; Tr. 1 at 85-86; Tr. 2 at 11-12).  Upon consideration, the undersigned is not persuaded by this argument.

The voluntariness of a defendant's statements is determined from whether "the defendant's will was overborne."  *Lignum v. Illinois*, 372 U.S. 528, 534 (1963). Voluntariness is determined by the totality of the circumstances. *Johnston v. Tampa Sports Auth.,* 530 F. 3d 1320, 1326-27 (11th Cir. 2008) *citing Schneckloth v. Bustamonte,* 412 U.S. 218, 226-27 (1973); *United States v. Blake*, 888 F. 2d 795, 798 (11th Cir. 1989).  Whether the person is in custody, the existence of coercion, the individual's awareness of his right to refuse, the individual's education and intelligence, and whether the person believes incriminating evidence will be found are all factors that should be considered in making a voluntariness determination. *Johnston,* 530 F. 3d at 1326-27 *citing Blake,* 888 F. 2d at 798; *see also United States v. Purcell,* 236 F. 3d 1274, 1281 (11th Cir. 2001).  This list of factors is certainly not all-inclusive.  *Johnston,* 530 F. 3d at 1326-27.  Other possible factors include whether officers had their guns drawn, whether *Miranda* warnings were given, and whether individual was told a search warrant could be obtained.  *United States v. Crapser,* 472 F. 3d 1141, 1149 (9th Cir. 2007) *citing United States v. Jones,* 286 F. 3d 1146, 1152 (9th Cir. 2002).

After reviewing the totality of the circumstances, the Court has determined that Defendant's statements and his consent to search were voluntary.  First, as discussed above, Defendant was not in custody.  While Defendant may have felt confined, a reasonable person in Defendant's position would have felt he was able to terminate the

17

interview.  The officers were invited in, were in plain clothes, and never indicated in any way to Defendant that they were armed (Tr. 1 at 79, 101; *also see* Gov't Exh. 4).  The officers did not tell Defendant he was, or would be, under arrest (*see generally*, Gov't Exh. 4; Tr. 1 at 104).  Neither did the officers promise Mr. Haffner that anything he said would not be used in a future prosecution.  *Cf.   United States v. Lall*, 607 F.3d 1277 (11th Cir. 2010) (finding the promise of an officer not to prosecute obviated earlier *Miranda* warnings concerning the voluntariness of a defendant's confession).  Second, from the audio of the interview, it is clear the nature of the agents' behavior was low-key, professional and created a cordial atmosphere (Gov't Exh. 3).  Nothing in the audio recording suggests the Defendant was intentionally intimidated or browbeaten into consent (Gov't Exh. 3).  The agents conducted themselves in such a manner as to observe Defendant's rights.

Defendant claims that the agents' presentation of the *Miranda* card, combined with Agent Greenmun's statement that this action was "procedural," was coercive conduct to obtain Defendant's consent (*see* Doc. #61 at 7).  Notwithstanding that  *Miranda* warnings were not necessary under the circumstances, the Court can not accept Defendant's claims. The Court does find the agents presented the *Miranda* card and had Defendant read aloud his rights in an abundance of caution.  Defendant was specifically made aware of his right to talk to an attorney and his right to stop the interview at anytime (Tr. 1 at 32, lines 1-3, 21-25; Gov't Exh. 4 at 9-10).  Defendant also testified to understanding that he had the option to talk to an attorney rather than the agents (Tr. 1 at 105-06).  Defendant was informed by the agents that he did not have to allow them to seize his computer, yet he signed a consent to search form and permitted the seizure (Tr. 1 at 12, 33, 87, 98; Gov't Exh. 2; Gov't Exh. 4 at 31).  On the record before the Court, there is no indicia of coercion.

Defendant asserts that he was in a vulnerable state due to life experiences and therefore his consent was made involuntarily (Doc. #61 at 7-9).   Defendant testified to having experienced a number of deaths of close friends and family members since he was very young (Tr. 1 at 89-91).  He testified these deaths "culminated in [his] brother's suicide in the summer of 2005" (Tr. 1 at 89) and he recently had "a good friend' pass away "from respiratory failure" (Tr. 1 at 91).  Defendant maintains that he is a "very vulnerable person and all these deaths and experiences took a toll" on him (Tr. 1 at 90).  Defendant also testified he had "gone out drinking" the night of April 28 and had not eaten within the twenty-four (24) hours before the agents arrived at his residence (Tr. 1 at 84; Tr. 2 at 12-13).  Defendant claims that having not eaten combined with having gone out drinking the night before contributed to his anxious and confused condition on April 29 (Tr. 1 at 84-85; Tr. 2 at 12-13).[6]  Defendant appears to argue this alleged overall vulnerability, and his mental and physical condition on April 29 in particular, interfered with his capacity to appreciate the consequences of waiving his rights.  This argument is not persuasive.

The undersigned has considered Defendant's alleged vulnerability and determined that while Defendant may have been through difficult times, Defendant was not so vulnerable on April 29, 2009 as to affect his ability to refuse to answer questions or to consent to a search of his computer.  *See generally United States v. Ramirez-Chilel,* 289 F. 3d 744, 752 (11th Cir. 2002) (finding an individual's ability to refuse consent is an important factor when examining whether a consent to search was made voluntarily).

---

[6]Defendant testified at the July 14, 2010 hearing that he had recently been diagnosed with hypoglycemia, a condition that may impact his physical and mental well-being (Tr. 2 at 12). There is no additional evidence in the record pertaining to Defendant's hypoglycemia.

Notwithstanding that Defendant may or may not have eaten for an extended period of time before the agents arrived at his residence, this fact was not disclosed to the agents and nothing in the audio recording of the interview suggests Defendant's demeanor was anything more than mildly nervous throughout the course of the approximately forty minute discussion. *Cf. United States v. Smith*, 322 Fed. Appx. 876 (11th Cir. Apr. 10, 2009) (the court found although the defendant had been intoxicated at least three hours prior to the jail interview, he made a knowing and voluntary waiver of his *Miranda* rights during the questioning); *United States v. Taylor*, 508 F.2d 761 (5th Cir. 1975) (the circuit court upheld the district court's denial of one defendant's motion to suppress and found the evidence did not support the defendant's allegation he was so affected by the influence of drugs allegedly taken that his statements were unreliable or involuntary); *United States v. Mack*, No. 07-238, 2009 WL 580430 (M.D. La. Mar. 6, 2009) (the court found the defendant's confession was voluntary despite the defendant's argument that administration of the Taser three times had created a coercive environment and impaired his ability to understand the nature of his rights and the ramifications of waiving those rights).[7]

Defendant was twenty-two years old at the time of this incident and was a college senior with a major in a behavioral science (Gov't Exh. 4 at 8-9). Defendant was living independently in an apartment with a number of roommates (some of whom were in the apartment while the ICE agents were present) and was engaged in gainful employment,

---

[7]Unpublished opinions may be cited throughout this order as persuasive on a particular point. The Court does not rely on unpublished opinions as precedent. Citation to unpublished opinions on or after January 1, 2007 is expressly permitted under Rule 32.1, Fed. R. App. P. Unpublished opinions may be cited as persuasive authority pursuant to the Eleventh Circuit Rules. 11th Cir. R. 36-2.

while also attending college (*see* Tr. 1 at 8, 77-79, 83-84).  Defendant ultimately graduated from Flagler College with *magna cum laude* honors (Tr. 1 at 87).  Defendant's age, level of education, and intelligence all weigh in favor of finding Defendant's statements were voluntarily made and Defendant had the ability to refuse consent.

The agents did not claim they could easily obtain a search warrant if Defendant refused to cooperate.  *See United States v. Crapser,* 472 F.3d at 1149 (finding the fact the defendant had been told a search warrant could be obtained was significant).  In fact, in this instance, the Court does not find any assertion of authority to force Defendant to talk or to surrender the computer.  The agents truthfully told Defendant that if he refused consent, the investigation would not end.  They did not tell Defendant that his computer would be searched whether or not he consented to a search.

Defendant claims that the student information obtained by ICE agents helped coerce him into making statements and consenting to the search of his computer (Doc. #60 at 1, Doc. #70 at 1).  Defendant testified that the presentation of his school records "overwhelmed" him (Tr. 2 at 12).  The Court accepts Defendant's contention that he believed the officers might find incriminating evidence on his computer (Gov't Exh. 4 at 24-25)[8] and acknowledges that this belief and the officers' apparent prior knowledge of his

---

[8]Excerpt of the transcript from the April 29, 2009 interview:
   Agent Greenmun: ...provided what you're saying is true, and you seem pretty straightforward, you know, provided that's true, I can get [the computer] back to you before classes.
   Mr. Haffner: My concern is that I haven't cleaned if off in a long time.
   Agent Greenmun: When is the last time that you were downloading anything like this?
   Mr. Haffner: It's– it's a long, long time ago, but I mean, I don't – I have a large hard drive so I rarely go through it.
   Agent Greenmun: Okay, So you're saying as far as you haven't cleaned it off in a

class schedule are factors to consider in determining the voluntariness of his statements and consent.  *See generally Johnston v. Tampa Sports Auth.,* 530 F. 3d at 1328 (whether a person believes incriminating evidence will be found is one of a number of factors to consider in determining voluntariness).  However, contrary to Defendant's assertions, the totality of the circumstances, as discussed above, reveals that Defendant's will was not overborne.

Review of the audio recording reveals Mr. Haffner answered the agents' inquiries coherently and intelligently.  It is also clear from the recording that Defendant was aware of the potential seriousness of the situation.  When Agent Greenmun referred to Mr. Haffner's comment that he (Haffner) had been "trading with quite a few people," and asked the Defendant if he could see where he (Greenmun) was "going," Defendant responded, "Oh, I absolutely see where you're going" and further acknowledged why law enforcement might be concerned with such activity (Gov't Exh. 4 at 20).  When Agent Greenmun inquired whether Mr. Haffner had some particular child pornography pictures still on his computer, the Defendant responded, "I certainly hope not" (Gov't Exh. 4 at 19).  When Agent Greenmun referred to an internet chat in which the Defendant allegedly told the other party he had to get off the conversation because his mother was right behind him, the Defendant somewhat sarcastically thanked both the agents for messing up his day (Gov't Exh. 4 at 19).

---

while, so that conversation may still be on that computer?
 Mr. Haffner: Perhaps.
 Agent Greenmun: And so there might be child pornography still on that computer?
 Mr. Haffner: Perhaps.
Gov't Exh. 4 at 24-25.

Thus, upon consideration of the totality of the circumstances, the undersigned finds Defendant's statements and Defendant's consent to search his computer were voluntarily and knowingly given.

**4.    Whether the search of Defendant's computer exceeded the scope of Defendant's consent**

Defendant next argues that the scope of the search of Defendant's computer exceeds any consent the Defendant may have given (Doc. #41 at 1-2).  Defendant asserts that the written consent for a "complete search" of Defendant's computer and the taking of other items did not specify a scope, nor authorize a full scale forensic analysis of Defendant's computer (Doc. #41 at 1-2).  Defendant claims the agents actually limited the length of time they could take to search Defendant's computer when they told Defendant the computer would be returned to Defendant the following Monday (Doc. #41 at 3-4).

The Eleventh Circuit in *United States v. Street*, discussing the scope of an individual's consent to search, noted that:

> "[a] consensual search is confined to the terms of its authorization.  The scope of the actual consent restricts the permissible boundaries of a search in the same manner as the specifications in a warrant.  When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless.  Rather it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." *United States v. Taylor*, 458 F. 3d 1201, 1206 (11th Cir. 2006) (quoting *United States v. Strickland*, 902 F. 2d 937, 941 (11th Cir. 1990)).  In assessing reasonableness, we consider what the parties knew to be the object of the search at the time the search occurred. *United States v. Martinez*, 949 F. 2d 1117, 1110 (11th Cir. 1992).

*United States v. Street*, 472 F. 3d 1298, 1308 (11th Cir. 2006).  In the instant case, Defendant signed a form that consented to a "complete search" of Defendant's computer

(Gov't Exh. 2).   Therefore, the test for whether the search of Defendant's computer exceeded the scope of Defendant's consent is whether a reasonable law enforcement officer would interpret the consent to a "complete search" of a computer to include a full forensic analysis, in light of the fact that the object of the search was child pornography. *See id.*

Here, the Court concludes that it was reasonable for the agents to interpret a "complete search" to include a full forensic analysis.  Defendant understood the object of the search to be child pornography, therefore it was reasonable for the agents to search in places where child pornography would reasonably be hidden.  *See generally, United States v. Harris*, 928 F. 2d 1113, 1118 (11th Cir. 1991) ("the defendant knew the officer was looking for drugs; therefore, both defendant and the officer would reasonably interpret the consent as constituting consent to search in places where narcotics would reasonably be hidden").  Pornographic images could be easily hidden within mislabeled folders, or even within folders stored on the computer that were not visible upon a cursory search of the hard drive.  A "complete search" of any computer, the purpose of which would be to find particular photographic images, would reasonably encompass review of every bit of data stored on the hard drive of the computer that might in actuality be an image of child pornography.  The evidence before the Court does not support any claim to have restricted the scope of the search.

Defendant claims the agents impliedly limited the scope of the search by promising the return of the computer before the following Monday (Doc. # 41 at 3).  However, it is clear from the audio of the interview that the agents only promised the computer would be returned that soon if Defendant was telling the truth and if there was no child pornography

on the hard drive (Gov't Exh. 3, Gov't Exh. 4 at 23-24).  The agents did not coax Defendant into giving consent, but bluntly told Defendant, "[Y]ou have to understand that we're not trying to sneak in on you or anything.  Whether or not we look at your computer is completely up to you." (Gov't Exh. 4 at 31.)

No evidence in the record indicates Defendant attempted to withdraw or amend his consent to search after it had been given.  The fact that Defendant did not object to the search, when the search exceeded what Defendant now claims was the scope of his consent, is persuasive that the search was, in fact, within Defendant's consent.  *See, e.g., United States v. Gordon*, 173 F. 3d 761, 766 (10th Cir. 1999) ("a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent.").

Accordingly, the Court finds Defendant's argument that the actual search of Defendant's computer exceeded the scope of Defendant's consent is without merit.

## 5.    Whether access to school records should render said records, and all evidence seized thereafter, subject to suppression

Finally, Defendant argues his school records were illegally seized from Flagler College in violation of the Family Educational Rights and Privacy Act (FERPA) (Doc. #60 at 1).  Defendant claims that FERPA gives him a statutorily reasonable expectation of privacy in his educational records and therefore, any and all fruits of the seizure of his records should be suppressed (Doc. #60 at 1; Doc. #70 at 1).  It is Defendant's belief that these educational records contributed to the discovery of Defendant's identity, coerced his waiver of *Miranda* rights and his consent to the seizure and search of his computer (Doc.

#70 at 1).  The United States claims the records obtained from Flagler College did not violate FERPA and, in any event, were not used to identify and contact Defendant or to obtain statements and evidence from Defendant (Doc. #65 at 1-2).  It is the position of the government that information received from the school is "directory information" (Doc. #65 at 2), that is not subject to the privacy interests set forth in FERPA.  *See* 20 U.S.C. § 1232g(a)(5)(A) (defining directory information relating to a student to include, *inter alia*, name, address, telephone listing, date and place of birth, major field of study, dates of attendance, and degrees and awards received).  The United States further argues that even if FERPA applied to the situation at hand, the government benefits from the law enforcement exception concerning the restriction on dissemination of student information to persons without the student's or parents' approval (*see* Doc. #65 *generally*).

The Court finds Defendant has misinterpreted the intent, and hence the application, of FERPA.  "Congress enacted FERPA under its spending power to condition the receipt of federal funds on certain requirements relating to the access and disclosure of student educational records."  *Gonzaga University v. Doe*, 536 U.S. 273, 278 (2002).  As noted by the Supreme Court in *Gonzaga University*, FERPA specifies in pertinent part:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein ...) of students without the written consent of their parents to any individual, agency, or organization.

*Gonzaga University*, 536 U.S. at 279, *quoting* 20 U.S.C. 1232g(b)(1).  The non-disclosure provisions in FERPA "speak only in terms of institutional policy and practice, not individual instances of disclosure."  *Id.* at 288.

In its examination of FERPA, the Court referred to its earlier decisions to support the finding that legislation enacted pursuant to Congress' spending power does not confer enforceable rights upon individuals.  *Gonzaga University*, 536 U.S. at 279-80 (citing *Pennhurst State, School and Hospital v. Halderman*, 451 U.S. 1 (1981)).  The plaintiff/respondent in *Gonzaga University* initially sued Gonzaga under 42 U.S.C. § 1983 for an alleged violation of FERPA concerning the release of certain personally identifiable information.  *Gonzaga University*, 536 U.S. at 276-77.  Ultimately, the Court held such an action was foreclosed because the relevant provisions of FERPA do not create any personal rights enforceable under Section 1983.  *Id.*

Here, Defendant would have the Court find FERPA creates an individual privacy right that is enforceable under the terms of the Act.  Such a finding, however, would clearly run counter to the intent of Congress as held by the Supreme Court in *Gonzaga University*.  *See Gonzaga University*, 536 U.S. at 287 (holding "there is no question that FERPA's nondisclosure provisions fail to confer enforceable rights").  Furthermore, there is no authority cited for applying the exclusionary rule to evidence obtained in violation of FERPA.  Defendant claims that FERPA provides a statutorily reasonable expectation of privacy in his educational records (Doc. #60 at 2).  The Court disagrees.

FERPA addresses the conditions under which a school may become ineligible for federal funding if it fails to follow certain standards for release of some types of student information.  20 U.S.C. § 1232g.  FERPA does not prohibit a request for, or the release of, student records.  *Tombrello v. USX Corp.*, 763 F.Supp. 541, 545 (N.D. Ala. 1991); *see also, Student Bar Ass'n Bd. of Governors, of Sch. of Law, Univ. of North Carolina at Chapel Hill v. Byrd,* 293 N.C. 594, 598 (N.C. 1977) (FERPA does not forbid disclosure of information

concerning a student).  Furthermore, in somewhat analogous situations, both the First and Fifth Circuits have said that when the government itself violates a regulatory provision the obtained evidence need not necessarily be suppressed.  *United States v. Edgar,* 82 F. 3d 499, 510-11 (1st Cir. 1996) (suppression of evidence is not a remedy for governmental violation of the Fair Credit Reporting Act); *United States v. Kington*, 801 F. 2d 733, 737 (5th Cir. 1986) (refusing to suppress records obtained in violation of the Right to Financial Privacy Act when Congress did not provide for that remedy in statute).  Thus, even if the Court were to find the law enforcement officers who interviewed the Defendant had obtained his personal information from Flagler College under a violation of FERPA, suppression of subsequent evidence discovered as a result of the school reports would not necessarily follow.

The Court finds no basis to accept Defendant's claim that the officers' possession of Defendant's school records, which apparently was comprised of two pages that contained the Defendant's address of record at his parent's home and his class schedules for the most recent and the upcoming semesters, so intimidated him that his will was overborne (*see* Tr. 2 at 12-16).  As discussed in more detail *supra*, the totality of the circumstances simply does not support Defendant's assertion.

Furthermore, the connection between the investigation into Mr. Haffner's alleged involvement with child pornography and the disputed school records is tenuous, at best. There is scant reference to the information from Flagler College on the audio recording of the April 29 interview (*see generally*, Gov't Exh. 4).  Although  ICE did contact Defendant after receiving the information from Flagler College, the school records did not contribute to the discovery of Defendant's identity.

The information from Flagler did not lead the agents to Defendant's residence in St. Augustine, Florida.  The interview took place at 114 Cedar Street in St. Augustine, Florida (*see* Tr. 1 at 8; Doc. #65-3, Report of Investigation).  Flagler College provided ICE with an address in Elkton, Florida (Gov't Exh. 2).  Defendant was identified through an investigative process that included the seizure and search of a computer in Virginia belonging to a Mr. Didio (Tr. 1 at 39-42).  Defendant's handle, gatekeeper2000, was found in Mr. Didio's friends list (Tr. 1 at 42-43).

In one of the chats with Mr. Didio, gatekeeper2000 identified himself as a twenty year old male (Tr. 1 at 47).  The user name "gatekeeper2000" was registered with Google, which subsequent to a summons informed ICE that the user name "gatekeeper2000" was associated with the email address "xopsychokow@gmail.com" (Tr. 1 at 42-43).  Following another summons, Google informed ICE that the name "Ian Haffner" went with the email address (Tr. 1 at 48-49).  Google also provided ICE an alternative email address of "psychokow@aol.com," and IP connection logs (Tr. 1 at 48-49).  ICE determined that the IP address used to log onto the xopsychokow@gmail.com account belonged to AT&T (Tr. 1 at 48-49).  AT&T informed ICE that the physical address associated with the xopsycholkow@gmail.com email account was 114 Cedar Street, Apartment 1 in St. Augustine, Florida (Tr. 1 at 49).

On these facts, the Court is satisfied that there was an independent source for the identification of Defendant and concludes the use of the referenced information obtained from Flagler College was inconsequential to the preliminary investigation and April 29 interview of Defendant.  *See generally, Segura v. United States*, 468 U.S. 796, 805 (1984) (evidence is not to be excluded if there is an independent source for discovery).

## V.  Recommendation

Based on the foregoing findings, the Court recommends Defendant's Motions to Suppress Evidence (Docs. #36, #37, #38, #41 and #60) be **DENIED**.  All physical evidence obtained, and oral and written statements made subsequent to questioning of Defendant at his residence on April 29, 2009 should be admissible evidence.

**DONE AND ORDERED** at Jacksonville, Florida this 31st day of August, 2010.

Copies to all counsel of record

**THOMAS E. MORRIS**
United States Magistrate Judge